2013-13-35. We'll hear from Mr. O'Malley when he's ready. May it please the Court, Joe O'Malley, Paul Hastings for Plaintiff Appellant SANOVION. I'm going to reserve five minutes for rebuttal. In its Martin ruling, the judge reviewed the specification and found no express definition for substantially free. He then correctly read decisions of this Court, like the Ecolab. It's essentially free, isn't it? Essentially free. I'm sorry. I'm not sure it makes a difference, but it's a key word. I just wanted to include it on the same page. It's a good point, because in the decisions, often these two terms are used synonymously as terms of approximation, but you're absolutely right. He then correctly read the precedent of this Court, like the Ecolab decision, for the proposition that customary definition for the term, essentially, the Court looked to a dictionary, as the on-back decision of this Court in Phillips has endorsed. But wasn't that term of the claim interpreted in light of the specification, which had essentially one example, and it was in the record a declaration by the inventor, which interpreted the example as corresponding to less than a quarter of a percent. And moreover, you had an interference earlier, and there was an admission from the prior owner of the patent that constitutes less than a quarter of a percent. And so how is the trial court wrong in construing that? Well, let me back up just what I think should have been a posture for reviewing those statements, and then I'll get to your question. Had the Court gone, now at the point in time where he finds no express definition in the spec, he looks for a definition in a dictionary, and he picks up Black's Law Dictionary. But the dictionary, as we held in Phillips, and had always held traditionally, it's a specification of controls. Sure. Although in Phillips, this Court said, in some cases, the ordinary meaning may be readily apparent even to lay judges. In such circumstances, general purpose dictionaries may be helpful. And there's been cases like Ecolab, and more recently, a Venice Pharma about a month ago, where a term like substantially or essentially was construed by reference to this ordinary and customary meaning, since it's a plain and ordinary and customary English word. Now, had the Court found an ordinary and customary meaning and didn't find one in Black's Law Dictionary, because it's not a legal term in art, then you look at the prosecution history for a clear disavowal. Instead, with no meaning having been found, either in the spec or in the claims, or in any dictionary, the Court turned to the prosecution history as a black slave to see, could any meaning be found in the prosecution history? Now, let me turn to your specific... There is some meaning in the specification, correct? There is some meaning in the specification. There are clues that they don't define the term, but I'll get back to it. There's certainly relevant evidence in the specification as to the meaning of the term. I want to finish answering Judge Lurie's question. I don't think I've gotten to it. Let's go to this declaration that, in better of itself, put into the prosecution history. Now, there were two samples prepared according to the procedure of example one, the only example in the patent. One was prepared, obviously, before the patent application was written. One was prepared some years later by Dr. Roussel. And what he said was that when he prepared his sample in a procedure as described by example one, that he got this ultra-pure 0.25%. Now, two points about that. First of all, I'd argue that he was not being definitional. The purpose of this declaration was not definitional. It was to satisfy an enablement requirement to show that he could, indeed, produce a sample that is made in accordance with the scope of the claims. He wasn't attempting to define what the outer limit of that claim was. Had he come back in his declaration and said, I found no detectable amount of the R isomer, that would have satisfied the enablement limit, too. Now, second point is, the claim term, the then-present invention, as he put it in his statement that we're construing today, the claim term that was his issue then was consisting essentially of. It was different than essentially free. Consisting essentially of is a term of art, as we know in the patent field, and has a specific construction. And as used by both the applicant and the examiner, it had a very limited construction. For example, on A-1774, the applicant says, in connection with adding this term consisting essentially one, he says, quote, claim one has been amended to recite Zopa clone consisting essentially of the D isomer. The amendment limits the claims to the D isomer, comma, excludes the L isomer, close quote. Similar, the examiner says, in speaking about the term consisting essentially of, it's entirely, quote, entirely, except for irrelevant materials, isomer D. He goes on to say, that's at A-1778, he goes on to say, quote, however, no such assertion is made in the spec that the product obtained does not have some L isomer content. Tell us about infringement. Now, on the infringement side, we have, first of all, if you adopt our construction of essentially free, wholly but not, largely but not wholly free, plain and ordinary meaning, supported by the plain and ordinary meaning, I'll argue in a moment. But what if we don't? Worst case analysis. Sure. If you don't, first of all, we would argue that we're still titled into a judgment of infringement under Bayer v. Elam. Right now, Reddy's has a spec that's before the FDA that says not more than 0.6%. Which includes all the way down to zero. All the way down to zero. They have this separate. And would infringe. And would infringe. They have this separate promise of certification that says we're not going to manufacture except over 0.3%. Now, we argue that Bayer v. Elam says in the Hatch-Waxman Act infringement contest, the focus has to be on the specification. And that case makes the point that the specification is very important in the Hatch-Waxman Act context. Specification, you mean the ANDA? The ANDA specification. Right. That's a promise you make to the FDA that that's what you're going to manufacture. If you make any false statements. That's what you'll get approved. That's what you'll get approved. And if you make any false statements. But doesn't the certification define the scope of that? The certification right now is not part of the ANDA specification. The FDA has made it clear, in this case and others, that they will not approve a specification that requires a minimum amount of some impurity. The R isomer in this context is considered impurity. So they can't put 0.3 in as a specification limit. So they have this separate sort of promise they've made to this report. But what's going to happen is it doesn't have any of the penalties of an ANDA spec violation. In other words, if you're found to violate your ANDA spec, you're subject to civil penalties, including withdrawal of approval of your ANDA. If FDA inspectors go into the plant in India and find batch after batch of 0.25, there are no repercussions. It's going to be in conformance. That certification to the court has got to count for something, doesn't it? Well, it's completely unenforceable. I mean, the district that I don't think... How about contempt of court? But Judge Lurie, I don't mean to seem like a smart aleck. The district of New Jersey won't be in the plant. They won't know what's being manufactured. If batches are manufactured 0.25, the FDA inspectors will say no problem, conforms to spec. Judge Rayna, I put your question off. I want to get back to it. I do believe the spec has relevant information that informs the analysis of this claim construction. And beginning with the first column, A136, the inventor says, the subject of the present invention is hence the dextrorotatory isomer of ZopaClone, its preparation and pharmaceutical compositions containing it. Now, that's a very broad statement of the scope of the invention. And that's how the original claims were first written, the de-isomer. Now, that is, in fact, also how the claims were written in the file history that leads to the issuance of the 673 patent. The claims, as they're originally written in a file history Reddy's never mentions, just simply says de-isomer. Now, there's no enablement rejection significantly of that scope of those claims, just as there was no enablement rejection of the de-isomer claim in the very parent application, the first application. And remember, the examiner says, when the claim term is consisting essentially of, he says, well, that could include 90, 10, S to R. And so it's clear that the examiner believes that the claims, as originally written, could include 90 and 10. Now, in the claims, finally, that come into the patent application and leads to the patent suit. What happens is there's no rejection for enablement. There's simply a 103 rejection over the race mate. The patentee adds in some claims that say substantially pure and some claims that say essentially free. But in his remarks, he says, we have given up no scope, no scope relative to de-isomer, which, again, we set in our spec as the present invention. He said, that's the same scope, substantially pure, as that de-isomer, which is basically the same scope as essentially free. So whereas consisting essentially of when the Rousseau declaration was written was a smaller scope and not definitional even with respect to that scope, the scope of the claim essentially free, we made clear, had the full scope of the de-isomer claims. We're into your rebuttal time that you wanted to save, but I think Judge Schall has a question. Yes, thank you, Judge Lurie. You were answering Mr. McBail, Judge Lurie's question about infringement, and I think the question was raised, what if we don't agree with your claim construction? What if we do agree with your claim construction? What happens then on infringement? Yeah, thank you. Right now, Reddy's has never contested that infringement under the broader largely but not wholly free construction. We said that in our brief. They came back and just said, well, we didn't move for cross-motion. Under this, and by the way, we didn't have an opportunity because the judge said we could submit no papers in opposition, which we contend was a procedural violation of the Third Circuit law. We think there's no reasonable juror, because even Reddy's presents no argument that could find non-infringement. Under Osram's case, we believe that you can reverse and find a judgment of infringement in our favor, and we have a limited number of time to get that done. Arguably, if we don't get a finding of infringement by the end of the year, if there's simply a remand, then we're not going to be able to take advantage of the pediatric exclusivity that attaches at the end of the year that we earned with these pediatric studies and get six more months that we're entitled to on this patent. I'll save the remainder of my time. Thank you, Mr. O'Malley. Mr. Sender. Thank you, Your Honor. May it please the Court. I'll talk a little about plain construction first, because that was the main part of Mr. O'Malley's argument. And the cases he cites, the Ecolab and the Ventus case, discuss the term substantially, which is not the term at issue here, which is essentially. And it was established, and in fact, Sanovia admitted that there was no plain meaning in this patent during the Martin proceedings, the judge so found, and therefore there was no clear disavowal needed. But when one looks to the prosecution history, it is very clear that both the examiner and the applicants understood that the word essentially, whether it was used as consisting essentially of or essentially free, meant something particular. The examiner at one point said it essentially, in quotes, was entirely except for irrelevant materials de-isomer. That's almost approximating zero. The applicants agreed with that, and later when they had two terms in their claim, they had both consisting essentially of and essentially free, the examiner, in his rejection for indefiniteness, said that essentially the preamble already required that it was essentially de-isomer, meaning that everything, including the L-isomer, was already excluded. And so he was viewing this, and in fact, in Sanovia's brief, they characterized what the examiner was doing as imposing a strict purity requirement. Again, we're approximating zero. What about infringement? You're asking the FDA to approve a product that would plainly infringe. The ANDA application, not more than 0.6%, could cover below 0.3 or 0.25. However, because of the internal specifications and the certifications submitted to Judge Kavanaugh, Dr. Reddy has undertaken not to release anything that's less than 0.3, which had formally been in their specification. How are you bound to that certification? We're bound to that because if we get approval from FDA and this product is on the market, Sanovian is free to buy it and test it. Just like in the Bayer-Millan case, the court said that it's appropriate to look at the ANDA specification plus any other relevant evidence or materials from either the patentee or the ANDA applicant. Here, the internal specification and certification are additional evidence, and Judge Kavanaugh recognized that because he initially, when the 0.3 lower limit was dropped because of FDA requirements, so it became 0 to 0.6, Judge Kavanaugh denied our summary judgment motion. He said that he, and it had been fully briefed. Suppose that Dr. Reddy violates the certification and starts selling below the 0.3 or even at 0.25 range. Would that be a willful infringement at that point, per se? I haven't considered whether it's willful. Certainly, it might be. Certainly, it would be an infringement should they do it. But if you certify you're not going to do it, then you do it. So that may be grounds for willful infringement. But certainly, yeah, if they're committed not to do it, and Synovia, I'm sure, would be the first to point out if they did it and sue for infringement and appropriate damages. So when Judge... Yeah, but we're dealing with the Hatch-Waxman context. Yes. Where the filing of the ANDA with its specifications and the request for approval within certain limits constitute infringement, then if you now have, through the FDA negotiations, the right to sell a product which, in fact, would infringe, then why wasn't the summary judgment of non-infringement incorrect? It was not incorrect because Dr. Reddy submitted the additional evidence that they would not sell the infringing product. When the judge initially denied it, he may have granted it because he had already had his claim construction. But when the FDA... Then why don't you... Why didn't you modify your ANDA? Well, initially the ANDA... To conform to that certification. Initially, the ANDA did have a 0.3 lower limit. But because of regulatory requirements, FDA required that to be dropped to zero. And so they had to amend... But they can't... They don't want to give you more than you're asking for. You're, in effect, asking for 0.25% and below. Well, we're also... If you say we don't want that, they're not going to say you have to have that authorization, will they? We are asking for 0.6 and below. And the intent is to market, to only produce and sell 0.3 to 0.6. And that's... That used to be, for a time, what they were asking for. FDA didn't like the lower limit, and so we're still asking for 0 to 0.6. But they've committed, and it falls within the ANDA requirement, we would only market to 0.3 to 0.6. And so there would not be infringement. I mean, we're free... If the FDA approves the range we've asked for, it doesn't mean we would be selling throughout the range. We voluntarily restrict our sales to be non-infringement. But with respect to infringement in the hash flag context, it should be determined based on what the ANDA asks for. And once you've modified it, partly at FDA request, to be within the infringing range, then that's, in effect, what you're asking for, isn't it? In effect, it's what we're asking for because it gives permission to be within the infringing range. But it's been made clear... And that's the context of an infringement judgment in a hatch-waxman situation. Well, usually it is. This is an exceptional case, and actually I think Bayer-Allan was similar, in that there were additional materials outside the context of the ANDA that governed what would be sold after approval. And because of the commitment here not to sell anything in the infringing range, we don't think there'd be any infringement, despite the fact that the FDA has required us to request this broader approval. But the... But the FDA hasn't asked you to ask for a range down to zero, below 0.25%? They have asked that we not have a lower limit. When we had a 0.3, actually up to 1 range, they said that was too high, in part because the innovator had a range of 0 to 0.3. And so they wanted us to cover that range as well in our application. And so that's... The reason we don't have approval currently is because we're still back and forth with the FDA, trying to prove that there's no safety issues, etc., things the FDA requests that we submit, with our 0.3 to 0.6. What's the safety issue when we're dealing with such small quantities of an isomer? We don't think there is, Your Honor. In fact, the racemate in this case has been sold in Europe for many years with no particular safety issues. But FDA, I presume out of an abundance of caution, has asked for various studies to show that if they grant something that's outside the innovator's range of purity, that there would not be a problem. So what's sold by Synovium now is not the racemate? In this country, they sell the enantiomer with less than 0.3. So they would sell the infringing... They're covered by their claim, as we read it. Senator, you heard the question I asked Mr. Malley about assume for the moment that we accepted the claim construction that he is urging, what would be the situation on infringement then? I'd ask you the same question. Yes. The problem with the claim construction he is urging is we don't understand fully what it means. You know, at one level, they've said that it could be anything up to 51% of the isomer, which we don't think the patent office... It's clear from the prosecution I would not have issued. So under what they're proposing currently, which was not specifically briefed below, there could be infringement. We think if the court wanted to use a non-numerical limitation, we think the court should be guided by what it's done in the Glaxo-Reinbaxy case, in which although they ended up assigning a number because of the prosecution history, rather than looking at a dictionary definition, as Synovium did, of the word substantially in applying it, the court actually went to the Webster's and said that essentially it means fundamentally. And then they went to the word free and said without. And so fundamentally without. And we think that that definition is wholly consistent with what the examiner was believing. But they're urging largely but not wholly free of the levera-tutori isomer. Correct. Under that, would there be infringement? Under that, if that's the definition the court adopts, it would be hard for us to argue that there wouldn't be because anything over 51% may infringe. And that's one of the reasons we think that's an improper definition. If the court went to dictionaries of the appropriate words, essentially free and defined fundamentally without, we think we would have non-infringement positions still because we are far more than zero. In that opinion, the court relied on a prior case in Maurici in which essentially free, the idea was it was to avoid unavoidable impurities. And here the amount of the isomer in our product is more than an unavoidable impurity. It's intentionally there to avoid infringement of what the examiner required to be an extremely pure product. We heard a couple of things that I want to take issue with. One was that the original claim to dextrorotary isomer never had an enablement rejection. Well, that's because it had an anticipation rejection. That claim would read on the racemate because the racemate is 50% dextrorotary isomer. And so after the anticipation rejection, they amended because the examiner wanted them to exclude the L isomer. And so they amended to be consisting essentially of and eventually to be essentially free language. And for Synovian to say that essentially free is just as broad as dextrorotary isomer is a through the looking glass moment. There's really no way we can understand that that's not a limitation. Has this patent expired except for the children's extension? It expires in December of this year, Your Honor. Of this year? Yes. Doesn't it go back 20 years from 1992? Well, they began applying way back. And this is an old. They've had a series of half a dozen patents. This is the last one to expire. It's December 31. And that was based on a patent term extension. These patents had been terminally disclaimed over prior patents which have already expired. So they're in extension terms. And then they went to pediatric term. The other through the looking glass moment, I just want to point out that this 90-10 situation, they say the examiner recognized that it could be 90. The examiner, when he was asking for proof of purity, he said the rotation data in example one of the specification didn't tell us anything about purity. And he threw out as an example it could be 90-10, it could be 10-90, it could be reciprocal of any numbers. And the point was that was unacceptable. And he could not find any. It was a very short specification. It's barely four columns including the claims. He could not find any information that would lead to understand that they actually had a pure invention. So the inventor Roussel came back and provided his declaration and said that his invention was the 0.25% L-isomer or less than 0.25. And during the request for interference in the amended, second amended preliminary amendment, the patentee said that after reviewing the Roussel declaration, the examiner understood this point that it was essentially free of the L-isomer and specifically suggested the essentially free language. So it's clear that the examiner's mind that 0.25 was essentially free. Thank you, Mr. Sender. Mr. Romali has a little more than two minutes rebuttal. Thank you. Now, in response to your question, what happens if the court accepts Sinovian's claim construction, for the first time I heard that Reddy's might like to go to a different dictionary definition, one that says fundamentally, and said that we hadn't really litigated our construction largely but not wholly. Below, we have. That's always been our plain meaning that we asserted. Now, we added on which encompasses 90% S because we believe that's supported by the record. Not only this enablement rejection, but you asked about the interference. I never really got to your question fully, Judge Flory. First of all, what we said in the interference, that's the only time that there was any space in time when the essentially free claim had any juxtaposition to the Roussel declaration. Now, before that, it was always different claim language, and this court has said recently in the Regents of University of Minnesota case, and before in Ventana, in general prosecution disclaimer only applied to a subsequent patent if that patent contains the same claim limitation as its predecessor. This is the only time you see Roussel discussed in the context of essentially free, and it was as support for the count. What the applicant says after discussing it is, thus, since the specs of RPR U.S. 1 to 7 are identical, applicants have support via 35 U.S.C. 120, each parent, et cetera, et cetera. In other words, the Roussel declaration was used as support, again, to show that you can make a species within the patent application. Now, the second point I wanted to make is... Didn't you use a Roussel declaration in the interference proceeding to tie the essentially free claim language to language of less than 25% of the IISOMER? Actually, it's just what I said just then. What we used Roussel was to show there was support for the count. In other words, the specification enables this count that includes essentially free. You could make a species encompassed within that language, not necessarily defining the language. But you used it to define the language. You defined essentially free. I'm sorry. I didn't mean to interrupt. We did not. There's a difference between saying, we can make something encompassed within the scope of the claim. That's not saying what is the outer limit. Had we made an example with 0% R, certainly that would have been support for essentially free, wholly but not largely, but not wholly. It would have been support for 90% because it would have been encompassed within that. We only use it as support and enablement function, not in a definitional way. And the interference examiner understood that. He said that our count, essentially free, was basically the same scope as the separate core patent 90% claim. So he understood that essentially free was not being limited, certainly not by our statement, to Roussel. I have 51 more seconds. As a matter of fact, maybe you're mistaking red for yellow. I'm sorry. I think your time is up. Thank you. Thank you, Mr. O'Malley. We'll take the case under advisement.